# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued April 24, 2008        Decided August 1, 2008

No. 07-5359

IN RE: NAVY CHAPLAINCY

CHAPLAINCY OF FULL GOSPEL CHURCHES, ET AL.,
APPELLANTS

v.

UNITED STATES NAVY, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 07ms00269)

*Arthur A. Schulcz, Sr.*, argued the cause and filed the briefs for appellants.

*Lowell V. Sturgill, Jr.*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the briefs were *Jeffrey S. Bucholtz*, Acting Assistant Attorney General, *Jeffrey A. Taylor*, U.S. Attorney, and *Robert M. Loeb*, Attorney. *Daniel E. Bensing*, Attorney, entered an appearance.

Before: ROGERS and KAVANAUGH, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH, in which *Senior Circuit Judge* SILBERMAN joins.

Dissenting opinion filed by *Circuit Judge* ROGERS.

KAVANAUGH, *Circuit Judge*:  A group of Protestant Navy chaplains sued the Navy, alleging that the Navy's operation of its retirement system discriminates in favor of Catholic chaplains in violation of the Establishment Clause.  But the plaintiffs do not claim that the Navy actually discriminated against any of them.  We conclude that plaintiffs lack standing to bring this claim, and we therefore affirm the judgment of the District Court.

I

The U.S. Navy maintains a Chaplain Corps of commissioned Navy officers to meet the spiritual needs of those who serve in the Navy and their families.  Like other officers, chaplains are subject to military regulations with respect to hiring, promotion, and retirement.

The Navy divides its chaplains into four categories – Catholic, liturgical Protestant, non-liturgical Protestant, and Special Worship.  As we explained in a previous opinion in this litigation, "liturgical Protestant" includes Protestant denominations that follow an established liturgy in worship services and practice infant baptism, such as Lutheran, Episcopal, Methodist, Presbyterian, and Congregational. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d

290, 294 (D.C. Cir. 2006) *(Chaplaincy)*. "Non-liturgical Protestant" includes Protestant denominations that do not follow a formal liturgy in worship services and that baptize at the age of reason, such as Baptist, Evangelical, Pentecostal, and Charismatic. *Id.* at 294. The "Special Worship" category refers to other religious faiths, both Christian and non-Christian, and it includes Jewish, Christian Science, Seventh-Day Adventist, Mormon, Buddhist, Hindu, Muslim, Jehovah's Witness, and Unitarian. *Id.* at 295 n.3.

Plaintiffs are non-liturgical Protestant Navy chaplains, both current and retired.[1] Plaintiffs filed suit, alleging that the Navy discriminates in favor of Catholic chaplains in certain aspects of its retirement system. *See In re Navy Chaplaincy*, No. 07-ms-269, slip op. at 1 (D.D.C. Oct. 15, 2007). Plaintiffs also sought a preliminary injunction.

The District Court initially denied plaintiffs' preliminary injunction motion, finding that the chaplains had not shown the necessary irreparable injury to support a preliminary injunction. *See Adair v. England*, Nos. 00-cv-566 & 99-cv-2945, slip op. at 2 (D.D.C. Feb. 7, 2005). On appeal, this Court reversed, explaining that, for purposes of a preliminary injunction, the allegation of an Establishment Clause violation itself demonstrates sufficient harm to satisfy the irreparable injury prong of the preliminary injunction test – assuming, of course, that the party has standing to allege the violation in the first place. *See Chaplaincy*, 454 F.3d at 303-04 & n.8. The Court therefore vacated the denial of a preliminary

---

[1] Plaintiffs also include certain organizations of non-liturgical Protestant chaplains. Because the organizations have standing in these circumstances only if one of their individual members has standing, we do not address them separately. *See Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 342-43 (1977).

injunction and remanded for the District Court to consider the remaining factors in the preliminary injunction analysis, including likelihood of success on the merits. *See id.* at 304-05.

On remand, in a well-reasoned opinion, the District Court concluded that plaintiffs lacked standing to bring this claim. This appeal followed.

II

Article III of the Constitution limits the judicial power to deciding "Cases" and "Controversies." "One of the controlling elements in the definition of a case or controversy under Article III is standing." *Hein v. Freedom from Religion Foundation, Inc.*, 127 S. Ct. 2553, 2562 (2007) (internal quotation marks and alteration omitted).[2] The three factors establishing the "irreducible constitutional minimum" of standing are well established. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). First and most relevant here is injury-in-fact: A would-be plaintiff must have suffered "an invasion of a legally protected interest" that is (i) "concrete and particularized" rather than abstract or generalized, and (ii) "actual or imminent" rather than remote, speculative, conjectural or hypothetical. *Id.* (internal quotation marks omitted); *see also Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1292-93 (D.C. Cir. 2007). Second is causation: The asserted injury must be "fairly traceable to the challenged action of the defendant." *Lujan*, 504 U.S. at 560 (internal quotation marks and alterations omitted). Third is redressability: It must be likely that a

---

[2] In referring to *Hein* throughout our opinion, we are referring specifically to Justice Alito's opinion, which is the binding opinion of the Court in that case. *See Marks v. United States*, 430 U.S. 188, 193 (1977).

favorable decision by the court would redress the plaintiff's injury. *Id.* at 561.

"[T]he law of Art. III standing is built on a single basic idea – the idea of separation of powers." *Allen v. Wright*, 468 U.S. 737, 752 (1984). The doctrine is "founded in concern about the proper – and properly limited – role of the courts in a democratic society." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The federal courts are "not empowered to seek out and strike down any governmental act that they deem to be repugnant to the Constitution." *Hein*, 127 S. Ct. at 2562. "Vindicating the *public* interest (including the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive." *Lujan*, 504 U.S. at 576; *see also Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 474-75 (1982).

Those critical and bedrock principles of separation of powers inform our approach to plaintiffs' claim.

## III

In reviewing the standing question, we must be "careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003). For purposes of our analysis in this case, we therefore must assume arguendo that the Navy's operation of its retirement system favors Catholic chaplains and disfavors non-liturgical Protestant chaplains in violation of the "clearest command of the Establishment Clause" – that "one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). Even assuming that plaintiffs' allegations are accurate, however, they do not have

standing to bring this claim against the Navy because they have not sufficiently demonstrated their own injury-in-fact.

If plaintiffs had alleged that the Navy discriminated against them on account of their religion, plaintiffs would have alleged a concrete and particularized harm sufficient to constitute injury-in-fact for standing purposes. But plaintiffs have conceded that they themselves did not suffer employment discrimination on account of their religion. They have conceded that the Navy did not deny them any benefits or opportunities on account of their religion. *See In re Navy Chaplaincy*, No. 07-ms-269, slip op. at 7-9 (D.D.C. Oct. 15, 2007). Rather, they suggest that *other* chaplains suffered such discrimination.

Plaintiffs argue that they nonetheless have standing for either of two reasons: (i) they are taxpayers who object to the Navy's allegedly discriminatory operation of its chaplaincy program, or (ii) they have been subjected to the Navy's "message" of religious preference as a result of the Navy's running a retirement system that favors Catholic chaplains. We disagree. Because plaintiffs' claim does not fit within the narrow confines of Establishment Clause taxpayer standing permitted by *Flast v. Cohen*, 392 U.S. 83 (1968), they do not have standing as taxpayers. *See Hein v. Freedom from Religion Foundation, Inc.*, 127 S. Ct. 2553, 2562-72 (2007). Nor do plaintiffs have standing based on their exposure to the Navy's alleged "message" of religious preference.

A

As the Supreme Court has repeatedly held, a taxpayer's interest in ensuring that appropriated funds are spent in accordance with the Constitution does not suffice to confer Article III standing. *See Hein*, 127 S. Ct. at 2563 (2007). Back in *Frothingham v. Mellon*, 262 U.S. 447 (1923),

taxpayers sued the Government, arguing that the Maternity Act of 1921 improperly invaded powers reserved to States by the Tenth Amendment.  The Supreme Court rejected taxpayer standing in that case:  "The administration of any statute, likely to produce additional taxation to be imposed upon a vast number of taxpayers, the extent of whose several liability is indefinite and constantly changing, is essentially a matter of public and not of individual concern.  If one taxpayer may champion and litigate such a cause, then every other taxpayer may do the same . . . ."  *Id.* at 487; *see also Doremus Bd. of Educ. v. Hawthorne*, 342 U.S. 429, 433-34 (1952).

In 1968, 45 years after *Frothingham*, the Supreme Court carved out a narrow exception to the general constitutional bar on taxpayer suits; the Court held that federal taxpayers had standing to bring an Establishment Clause challenge to federal financing for parochial schools.  *See Flast*, 392 U.S. 83.  But according to *Flast*, taxpayers may bring an Establishment Clause challenge only when they challenge legislation passed pursuant to the Taxing and Spending Clause in Article I, § 8 of the Constitution.  *See id.* at 102-03.

The Court has subsequently made clear that *Flast* is a very narrow exception to the general bar against taxpayer standing.  In *Valley Forge*, for example, the plaintiffs argued that the Government violated the Establishment Clause when it transferred a tract of "surplus property" to a Christian college. *Valley Forge Christian Coll. v. Americans United for Separation of Church & State*, 454 U.S. 464, 467-68 (1982) (internal quotation marks omitted).  The Court found that the plaintiffs, a group composed of "90,000 taxpayer members," did not have standing both because the challenged action was executive rather than legislative and because the property transfer was an exercise of executive authority pursuant to legislation passed under the Property Clause in Article IV, § 3

of the Constitution rather than the Taxing and Spending Clause in Article I, § 8. *Id.* at 469, 479-80 (internal quotation marks omitted).

In *Bowen v. Kendrick*, the Supreme Court allowed a group of federal taxpayers to challenge the Adolescent Family Life Act, a statute appropriating funds for religious organizations, among others, to fight teen pregnancy. 487 U.S. 589, 593, 596-97 (1988). The Court found that plaintiffs' claim challenged a program expressly authorized by Congress under the taxing and spending power, thus fitting within *Flast*. *Id.* at 619. The key to *Bowen*'s conclusion, as the Court has subsequently explained, was that the statute was "'at heart a program of disbursement of funds pursuant to Congress' taxing and spending powers'" and that plaintiffs' claims were concerned with the expenditure of funds "'pursuant to the AFLA's statutory mandate.'" *Hein*, 127 S. Ct. at 2567 (quoting *Bowen*, 487 U.S. at 619-20) (emphasis omitted).

In its recent decision in *Hein*, the Court declined to expand *Flast* to encompass discretionary Executive Branch spending: "Because almost all Executive Branch activity is ultimately funded by some congressional appropriation, extending the *Flast* exception to purely executive expenditures would effectively subject every federal action – be it a conference, proclamation or speech – to Establishment Clause challenge by any taxpayer in federal court." *Id.* at 2569. Although *Hein* did not eliminate the *Flast* exception to the bar against taxpayer standing, the case forcefully emphasized the exception's extremely limited contours: "It is significant that, in the four decades since its creation, the *Flast* exception has largely been confined to its facts." *Id.* at 2568-69. As *Hein* explained, the Court has limited the "expansion of federal taxpayer and citizen standing in the

absence of specific statutory authorization to an outer boundary drawn by the results in *Flast*." *Id.* at 2569 (internal quotation marks and emphasis omitted).[3]

In this case, plaintiffs' claim does not fit within the narrow *Flast* exception. No legislative enactment expressly authorizes or appropriates funds for the Navy to favor Catholic chaplains in its retirement system. Plaintiffs cite, for example, the statutes establishing the Navy Chaplain Corps, but those statutes make no reference to denominational category, only to chaplains generally. *See* 10 U.S.C. §§ 5142, 5150. And plaintiffs, who themselves are chaplains, obviously do not contend that congressional legislation establishing the Navy Chaplaincy itself violates the Establishment Clause; they merely want the Navy to operate the Chaplain Corps differently. *Cf. Katcoff v. Marsh*, 755 F.2d 223 (2d Cir. 1985) (approving military chaplaincy program).

As in *Hein*, the challenged expenditures here – extra salary and retirement-related benefits allegedly provided to Catholic chaplains – "were not expressly authorized or mandated by any specific congressional enactment." *Hein*, 127 S. Ct. at 2568. Indeed, plaintiffs contend that the Chaplain Corps is being operated by the Navy in contravention of the law, not in accordance with the law. *See* Plaintiffs' Br. 48 ("Appellees have not followed either the law

---

[3] The *Flast* exception may be further limited to Congress's disbursement of federal funds *outside the Government*. In both *Flast* and *Bowen v. Kendrick*, the only two Supreme Court cases upholding taxpayer standing, the statutes authorized disbursement of federal funds to outside entities, including religious organizations. But we need not address that question in this case given that plaintiffs' argument for taxpayer standing fails at a more basic level.

or the DOD regulations."). Under the Supreme Court's precedents, that contention directly undermines any claim to taxpayer standing. In sum, plaintiffs do not have standing as taxpayers.

B

Plaintiffs alternatively contend that they have standing because "Establishment Clause injury flows from the forbidden messages of preference or disapproval" inherent in the Navy's denominational preference. Plaintiffs' Br. 28. In so arguing, they rely primarily on this Court's decision in *Chaplaincy*, which explained that for the purposes of a preliminary injunction, the "mere allegation" of an Establishment Clause violation is always sufficient to show irreparable harm. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303-04 (D.C. Cir. 2006). Plaintiffs claim that because their allegations demonstrate irreparable injury for preliminary injunction purposes, they have necessarily shown injury-in-fact for standing purposes.

But the Court in *Chaplaincy* merely held that the allegation of an Establishment Clause violation is sufficient to satisfy the irreparable harm prong of the preliminary injunction standard – *presupposing that a party has standing to allege such a violation. See id.* at 303-04 & n.8. A per se rule defining automatic injury-in-fact for every plaintiff who claims an Establishment Clause violation – as plaintiffs strain to find in the *Chaplaincy* opinion – would run counter to decades of settled jurisprudence setting forth the requirements for standing in Establishment Clause cases. Jurisdictional requirements are not disposed of so easily, and the Court in *Chaplaincy* did not purport to make the sweeping change attributed to it by plaintiffs.

Apart from citing *Chaplaincy*, plaintiffs also claim injury-in-fact from their being subjected to the "message" of religious preference conveyed by the Navy's allegedly preferential retirement program for Catholic chaplains. The program, they say, makes them feel like second-class citizens within the Navy Chaplaincy even if they themselves have not suffered discrimination on account of their religion.

As the Supreme Court has often stated, mere personal offense to government action does not give rise to standing to sue. *Allen v. Wright*, 468 U.S. 737, 752-54 (1984); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 575-76 (1992). "By the mere bringing of his suit, *every* plaintiff demonstrates his belief that a favorable judgment will make him happier. But although a suitor may derive great comfort and joy" from knowing that the Government is following constitutional imperatives, "that psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998). "Recognition of standing in such circumstances would transform the federal courts into no more than a vehicle for the vindication of the value interests of concerned bystanders." *Allen*, 468 U.S. at 756 (internal quotation marks omitted).

Plaintiffs respond that their claim is similar to religious display and prayer cases where courts have found (or at least apparently assumed) standing. *See, e.g.*, *McCreary County v. ACLU*, 545 U.S. 844, 851-52 (2005) (Ten Commandments displays that were "readily visible" to citizens conducting civic business) (internal quotation marks omitted); *Van Orden v. Perry*, 545 U.S. 677, 681-82 (2005) (Ten Commandments display on the grounds of the Texas State Capitol that petitioner frequently encountered); *County of Allegheny v. ACLU*, 492 U.S. 573, 578 (1989) (crèche display in county

courthouse and menorah display outside city-county building); *Suhre v. Haywood County*, 131 F.3d 1083, 1086 (4th Cir. 1997) (Ten Commandments display in county courtroom; noting that display cases are "particularized subclass of Establishment Clause standing jurisprudence"); *see also Lee v. Weisman*, 505 U.S. 577, 580 (1992) (governmental prayer at school graduation); *Marsh v. Chambers*, 463 U.S. 783, 784-85 (1983) (daily prayer at opening of state legislature); *Sch. Dist. of Abington Township v. Schempp*, 374 U.S. 203, 205-12 (1963) (daily Bible reading in class); *Engel v. Vitale*, 370 U.S. 421, 422-23 (1962) (official state prayer in class).

These Supreme Court cases do not all directly discuss the standing issue. It is a well-established rule that "cases in which jurisdiction is assumed *sub silentio* are not binding authority for the proposition that jurisdiction exists." *John Doe, Inc. v. DEA*, 484 F.3d 561, 569 n.5 (D.C. Cir. 2007) (internal quotation marks omitted). In any event, accepting those cases as precedents on standing,[4] we nonetheless find significant differences between plaintiffs' case and the religious display and prayer cases. In the religious display and prayer cases, the Government was actively and directly communicating a religious message through religious words or religious symbols – in other words, it was engaging in religious speech that was observed, read, or heard by the plaintiffs in those cases. Here, by contrast, the Navy is not communicating a religious message through religious words or religious symbols. Plaintiffs' objection here is more akin to the objection to the property transfer in *Valley Forge*,

---

[4] *See generally Doe v. Tangipahoa Parish Sch. Bd.*, 494 F.3d 494, 499-502 (5th Cir. 2007) (DeMoss, J., concurring); Ira C. Lupu & Robert W. Tuttle, *Ball on a Needle:* Hein v. Freedom from Religion Foundation, Inc. *and the Future of Establishment Clause Adjudication*, 2008 B.Y.U. L. REV. 115, 158-64 (2008).

where the Court stated that the plaintiffs failed "to identify any personal injury suffered by them as a consequence of the alleged constitutional error, other than the psychological consequence presumably produced by *observation of conduct* with which one disagrees. That is not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms." *Valley Forge*, 454 U.S. at 485-86 (emphasis added and omitted); *see also Suhre*, 131 F.3d at 1086 (quoting *Valley Forge* and stating "a mere abstract objection to unconstitutional conduct is not sufficient to confer standing").

Plaintiffs' argument would extend the religious display and prayer cases in a significant and unprecedented manner and eviscerate well-settled standing limitations. Under plaintiffs' theory, every government *action* that allegedly violates the Establishment Clause could be re-characterized as a governmental *message* promoting religion. And therefore everyone who becomes aware of the "message" would have standing to sue. The neighbors in *Valley Forge*, the hotel workers at a conference for faith-based organizations in *Hein*, the list goes on – all could have obtained standing to sue simply by targeting not the government's action, but rather the government's alleged "message" of religious preference communicated through that action. Indeed, as plaintiffs' counsel acknowledged at oral argument, under plaintiffs' standing theory any recipient of the Navy's "message" in this case, including the judges on this panel, would have standing to bring suit challenging the allegedly discriminatory Chaplain Corps. Oral Arg. Tr. at 6-7. The jurisdictional requirements of Article III are not so manipulable. They do not allow anyone who becomes aware of a government action that allegedly violates the Establishment Clause to sue over it on the ground that they are offended by the allegedly unconstitutional "message" communicated by that action. In

the government employment context at issue here, it thus comes as no surprise that neither plaintiffs nor the dissent has cited any case holding that a plaintiff can maintain a religious employment discrimination suit under the Religion Clauses when complaining about employment discrimination suffered by others, not by the plaintiff himself or herself. We think the reason for the dearth of precedent is evident: When plaintiffs are not themselves affected by a government *action* except through their abstract offense at the *message* allegedly conveyed by that action, they have not shown injury-in-fact to bring an Establishment Clause claim, at least outside the distinct context of the religious display and prayer cases.

To be sure, we recognize that plaintiffs' creative analogy to the religious display and prayer cases has some surface logic. But the implications of plaintiffs' theory for standing doctrine are quite radical: Plaintiffs seek to use the religious display and prayer cases to wedge open the courthouse doors to a wide range of plaintiffs alleging Establishment Clause violations who were previously barred by bedrock standing requirements – requirements that are essential to preserving the separation of powers and limited judicial role mandated by the Constitution. We decline the invitation to transform Establishment Clause standing doctrine in this way. What the Supreme Court said last year in *Hein* applies just as well to plaintiffs' reliance on the religious display and prayer cases here: "It is a necessary concomitant of the doctrine of *stare decisis* that a precedent is not always expanded to the limit of its logic." *Hein*, 127 S. Ct. at 2571.

\* \* \*

We affirm the judgment of the District Court.

*So ordered.*

ROGERS, *Circuit Judge*, dissenting: The Establishment Clause prevents "the Government's placing its official stamp of approval upon one particular kind of prayer or one particular form of religious services," *Engel v. Vitale*, 370 U.S. 421, 429 (1962), and ensures that "all creeds . . . be tolerated and none favored," *Lee v. Weisman*, 505 U.S. 577, 590 (1992); *see McCreary County v. Am. Civ. Liberties Union of Ky.*, 545 U.S. 844, 860 (2005). A governmental accommodation for religion may violate the Establishment Clause if it "singles out a particular religious sect for special treatment" because "whatever the limits of permissible . . . accommodations may be . . . , it is clear that neutrality as among religions must be honored." *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 706-07 (1994) (citations omitted). "'When the power, prestige and financial support of government [are] placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain.'" *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 221 (1963) (quoting *Engel*, 370 U.S. at 430-31).

In *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006), the court thus observed that the liberty interest shielded by the Establishment Clause is "protection against government imposition of a state religion *or religious preference*," *id.* at 302 (emphasis added). Stating that "the Establishment Clause is implicated as soon as the government engages in impermissible action," *id.*, the court explained that unlike freedom of expression cases, for example, "[t]he harm inflicted by religious establishment is self-executing and requires no attendant conduct on the part of the individual," *id.* at 303; *see also id.* at 302. In describing the impermissible government action at issue, the court stated:

Where, as here, the charge is one of official preference

of one religion over another, such governmental endorsement "sends a message to nonadherents [of the favored denomination] that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community."

*Id*. at 302 (quoting *Lynch v. Donnelly*, 465 U.S. 668, 688 (1984) (O'Connor, J., concurring)) (alteration in original). The court held that such an allegation sufficed to show irreparable harm, or "injury [that is] beyond remediation [by monetary damages]," *id*. at 297, for the purpose of obtaining injunctive relief, crediting appellants' allegation of "the harm that flows from the 'forbidden message' of marginalization [that the Navy's] actions send to [them]," *id.* at 299 (quoting Appellants' Br. at 20). The court did not expressly hold that appellants[1] had Article III standing, *but see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998), but noted that its legal "conclusion presupposes, of course, that the party has standing to allege such a violation," *Chaplaincy*, 454 F.3d at 304 n.8.

The court's decision in *Chaplaincy* regarding appellants' liberty interest that is protected by the Establishment Clause and the nature of their injury is no less applicable here. The same parties and the same charge are involved, *see LaShawn A. v. Barry*, 87 F.3d 1389, 1393-95 (D.C. Cir. 1996) (en banc), and injury sufficient for irreparable harm has resonance for injury-in-fact under Article III, *see Taylor v. Resolution Trust Corp.*, 56

---

[1] Due to the consolidation of three cases, appellants include active duty, reserve, retired, and former non-liturgical Protestant Navy chaplains as in *Chaplaincy*, and two endorsing agencies — Chaplaincy of Full Gospel Churches and Associated Gospel Churches. Hereinafter in referring to "appellants," I refer only to the chaplains currently serving in the Navy Chaplain Corps.

F.3d 1497, 1508 (D.C. Cir. 1995), because to show irreparable harm "[a] plaintiff must do more than merely allege . . . harm sufficient to establish standing," *Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1410 (9th Cir. 1991). As explained in *Chaplaincy*, "[t]his court has set a high standard for irreparable injury" within the preliminary injunction inquiry. 454 F.3d at 297. Such injury must be "both certain and great," "actual and not theoretical," "beyond remediation," and also "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Id*. (quotation marks and citations omitted). For Article III, the requisite injury-in-fact must be "concrete and particularized" and "actual or imminent," not "hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quotation marks omitted). Because "the Navy's alleged violation of the Establishment Clause per se constitutes irreparable harm," *Chaplaincy*, 454 F.3d at 299, appellants have met their burden on the injury prong of Article III standing.[2]

As members of non-liturgical Protestant churches and fellowships, appellants assert that the Navy has singled out the Catholic faith as the preferred religious tradition in its Chaplain Corps by choosing over several decades to allow only Catholic

---

[2] To the extent the court seeks to avoid this precedent by interpreting a footnote in *Chaplaincy* to indicate that the court was "presupposing" appellants' standing, Op. at 10, and thus addressing the request for injunctive relief without satisfying itself that appellants had standing, its approach is contrary both to the principle in *Steel Co.*, 523 U.S. at 94-95, and to the more natural reading of the footnote as merely recognizing, as this court has done before, that this prong of the preliminary injunction inquiry and the entirety of the Article III standing inquiry "overlap[] . . . somewhat," but are not coextensive, *see Taylor*, 56 F.3d at 1508.

4

chaplains to serve beyond the required separation dates.[3] This sends a message of denominational preference for Catholics and marginalization for non-Catholic adherents, causing appellants to suffer psychological harm while serving as chaplains. Compl. ¶¶ 3, 37(e), 39. By endowing Naval officer status in a preferential manner upon the representatives of a particular type of religious ministry,[4] who then, as part of their Naval service duties, use words and symbols to serve their religious cause, the

---

[3]  According to appellants, "the 4109 program" has three parts: (1) illegal appointments to active duty through age waivers for over-age Catholic clergy, (2) the consequent illegal continuation of such clergy as chaplains to the age of 67, and (3) the eventual illegal transfer of such clergy to the Retired Reserve and subsequent recall to active duty as designated 4109 Reservists. The program is designed in part to allow Catholic chaplains who have reached their statutory separation age to continue to serve until they have completed twenty years of service and become eligible for pensions. *See* 10 U.S.C. §§ 1251, 14509, 14703; *see also Chaplaincy*, 454 F.3d at 293-96. At the time appellants filed their complaints, the age limit for the appointment of chaplains, like other officers, was forty-two, *see* 10 U.S.C. § 532(a)(2); while this provision is no longer applicable to chaplains, *id.* at § 532(d)(1) (as amended by Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, Pub. L. No. 108-375, 188 Stat. 1811, 1872 (Oct. 28, 2004)), the statutory separation age for chaplains and other officers remains in effect.

[4]  Appellants cite a list of Catholic chaplains coded as "4109" currently serving with them in the Navy Chaplain Corps, and assert that additional chaplains are destined to become 4109 chaplains in view of the Navy's list of Catholics appointed after age forty-two and extended on active duty and the dates they become eligible for pensions. For example, non-liturgical Protestant Chaplain Stewart served with over-age Catholic Chaplain Erestain. After this court's decision in *Chaplaincy*, it appears that the Navy extended two non-Catholic chaplains for service beyond the age of 62. *See* 454 F.3d at 295.

5

Navy allegedly has "take[n] sides in a religious matter, effectively discriminating in favor of [one religion's] view," *Commack Self-Serv. Kosher Meats, Inc. v. Weiss*, 294 F.3d 415, 425 (2d Cir. 2002), of the type of religious ministry that is most appropriate to serve "the religious needs of sailors," *In re England*, 375 F.3d 1169, 1171 (D.C. Cir. 2004). *See, e.g.*, *McCreary County*, 545 U.S. at 860; *Kiryas Joel Vill.*, 512 U.S. at 698-705.

Appellants have suffered particularized Article III injury because they are not strangers to the Navy's 4109 program. Their membership within the Chaplain Corps and their resulting receipt of a message of denominational preference make them comparable to a citizen who has "personal contact with the alleged establishment of religion," *Suhre v. Haywood County*, 131 F.3d 1083, 1086 (4th Cir. 1997), such as in the religious display cases.[5] Appellants' charge does more than present a "creative analogy" with "some surface logic," Op. at 14, as the court offers no basis for its unsupported conclusion that this case is different from "the distinct context of the religious display and prayer cases," *id.* As counsel for the Navy acknowledged, "if a chaplain . . . is personally exposed to a [message of religious preference], there would be traditional standing." Oral Arg. Tr. at 13 (Apr. 24, 2008). That is what appellants allege in

[5] *See, e.g.*, *Vasquez v. L.A. County*, 487 F.3d 1246, 1250-51 (9th Cir. 2007); *Doe v. Tangipahoa Parish Sch. Bd.*, 473 F.3d 188, 196 (5th Cir. 2006); *ACLU Neb. Found. v. City of Plattsmouth*, 358 F.3d 1020, 1026-31 (8th Cir. 2004), *adopted in relevant part*, 419 F.3d 772, 774 n.4 (8th Cir. 2005) (en banc); *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 72 (2d Cir. 2001); *Washegesic v. Bloomingdale Pub. Schs.*, 33 F.3d 679, 682-83 (6th Cir. 1994); *Doe v. County of Montgomery*, 41 F.3d 1156, 1159-60 (7th Cir. 1994); *Foremaster v. City of St. George*, 882 F.2d 1485, 1490-91 (10th Cir. 1989); *Saladin v. City of Milledgeville*, 812 F.2d 687, 691-93 (11th Cir. 1987); *Allen v. Hickel*, 424 F.2d 944, 947 (D.C. Cir. 1970).

charging that the 4109 program establishes an "official preference of one religion over another" that causes them psychological injury due to their personal and direct receipt of the "'message . . . that they are outsiders, not full members'" of the Navy's Chaplain Corps. *Chaplaincy*, 454 F.3d at 302 (quoting *Lynch*, 465 U.S. at 688 (O'Connor, J., concurring)). Appellants' injury is thus as particularized, *see Lujan*, 504 U.S. at 561 n.1, 573-74; *Warth v. Seldin*, 422 U.S. 490, 502 (1975), as that of the children in *Schempp*, 374 U.S. at 223-24, to whom school prayers were read, the plaintiffs in *Women's Equity Action League* (*WEAL*) *v. Cavazos*, 879 F.2d 880, 884-85 (D.C. Cir. 1989), who were enrolled or employed in segregated schools, and the state legislator in *Marsh v. Chambers*, 463 U.S. 783, 786 n.4 (1983), who objected "as a member of the Legislature" to the use of a state-employed chaplain to convene its sessions. As members of a statutorily-defined community within the armed forces, appellants are not mere bystanders, *Allen v. Wright*, 468 U.S. 737, 756 (1984), and they did not "roam the country," *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State*, 454 U.S. 464, 487 (1982), in search of impermissible government action.[6]

---

[6] Contrary to the court's suggestion, Op. at 12-13, *Valley Forge* included no indication that the Supreme Court questioned the plaintiffs' standing on the ground that a government land transfer to a religious institution could not send a message of government endorsement of religion and thus violate the Establishment Clause. The Court based its Article III holding on the fact that the plaintiffs did not live in the state where the land transfer had occurred, had learned about it indirectly through a press release, and indicated no connection with the transfer that could personalize their stake in the suit. *See* 454 U.S. at 486-87; *see also ASARCO Inc. v. Kadish*, 490 U.S. 605, 616 (1989). As our sister circuits have held, *Valley Forge*'s holding, 454 U.S. at 485-87, suggests that "[t]he neighbors in *Valley Forge*," Op. at 13, may be the very plaintiffs who would have had standing there. *See, e.g.*, *Suhre*, 131 F.3d at 1087; *Washegesic*, 33

The uniqueness of appellants' injury as chaplains in relation to their service in the Navy Chaplain Corps eliminates the concern expressed in *Valley Forge* that recognizing their standing would, in this court's words, inappropriately "wedge open the courthouse doors," Op. at 14; *see also id.* at 10, 13. Appellants' charge is based on an injury distinct to their status within the Chaplain Corps, *see Schempp*, 374 U.S. at 224 n.9; *Chaplaincy,* 454 F.3d at 302; *see also WEAL*, 879 F.2d at 884-85, and, "like *Schempp* before it, *Valley Forge* recognized that direct contact with an unwelcome religious exercise or display works a personal injury distinct from and in addition to each citizen's general grievance against unconstitutional government conduct," *Suhre*, 131 F.3d at 1086. Their alleged "genuine feeling of exclusion from the community . . . , and the deep offense from a perceived insult to one's religious view committed by the government in one's community," *Ariz. Civ. Liberties Union v. Dunham*, 112 F. Supp. 2d 927, 935 (D. Ariz. 2000); *see Suhre*, 131 F.3d at 1087; *Saladin*, 812 F.2d at 692-93, demonstrates that appellants have suffered a personal injury-in-fact.

To reach the opposite conclusion, the court ignores both the nature of appellants' charge and binding precedent. First, the court describes the charge as if it concerns only religious discrimination in traditional monetary terms, such as retirement benefits not denied to appellants or "discrimination suffered by others." *See* Op. at 2, 3, 6, 14. Yet appellants do not so delimit their charge; rather, they allege that the Navy's 4109 program violates the Establishment Clause by creating a government

F.3d at 682-83; *ACLU of Ga. v. Rabun County Chamber of Commerce, Inc.*, 698 F.2d 1098, 1106-07 (11th Cir. 1983).

religious preference, *see Chaplaincy*, 454 F.3d at 302.[7] Appellants' standing thus does not hinge upon the mistreatment of any individual chaplain but upon the Navy's alleged endorsement of a preference for another religious faith that directly affects them. The court's narrow focus ignores the Constitution's requirement that, in assessing constitutional injury, "we keep in mind 'the myriad, subtle ways in which Establishment Clause values can be eroded,'" and that in addition to the mistreatment of an individual, "we [must] guard against other different, yet equally important, constitutional injuries," such as the unconstitutional implementation of a government policy. *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 314 (2000) (quoting *Lynch*, 465 U.S. at 694 (O'Connor, J., concurring)).

Second, the court states that "mere personal offense" or emotional injury is never enough for Article III injury, Op. at 11, but that is not the law.[8] As the Supreme Court acknowledged in *Association of Data Processing Service Organizations, Inc. v.*

---

[7] Although the court suggests that appellants have waived aspects of their allegations, Op. at 6, 13, the record is clear that they have not abandoned their Establishment Clause charge of an unconstitutional endorsement of a religious denomination that is particularized to them personally. Oral Arg. Tr. at 8-10; 25. Counsel emphasized that it is appellants' "direct contact [with the 4109 program and its message] because of the small community" that creates their injury, *id.* at 8, for due to their direct exposure as chaplains, they experience the 4109 program as a type of faith discrimination, "a religious gerrymander," because "[i]t draws lines" to favor one religious faith over another. *Id.* at 10; *see also* Appellants' Br. at 27.

[8] *See, e.g.*, *Am. Soc'y for Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus*, 317 F.3d 334, 337-38 (D.C. Cir. 2003).

9

*Camp*, 397 U.S. 150 (1970), "[a] person . . . may have a spiritual stake in First Amendment values sufficient to give standing to raise issues concerning the Establishment Clause" if directly affected by the challenged governmental practice, *id.* at 154 (citing *Schempp*, 374 U.S. 203); *see Valley Forge*, 454 U.S. at 486-87 & n.22. Later, in *Allen*, 468 U.S. at 755, while holding that a plaintiff alleging an equal protection violation generally must claim a personal denial of equal treatment, the Supreme Court observed that "[t]here can be no doubt that . . . noneconomic injury [such as stigmatizing injury] is one of the most serious consequences of discriminatory government action and is sufficient in some circumstances to support standing."[9] In fact, the Supreme Court has reached the merits in numerous Establishment Clause cases where "mere personal offense," Op. at 11, resulting from a plaintiff's connection to a challenged practice appears to have provided the main possible injury to ground standing.[10] As the Fourth Circuit has observed:

> [T]he Establishment Clause plaintiff is not likely to

---

[9] *See, e.g.*, *WEAL*, 879 F.2d at 884-85; *Gray v. Greyhound Lines, E.*, 545 F.2d 169, 175 (D.C. Cir. 1976); *see also Shaw v. Hunt*, 517 U.S. 899, 904 (1996) (citing *United States v. Hays*, 515 U.S. 737 (1995); *Shaw v. Reno*, 509 U.S. 630 (1993)); *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 211 (1972); Richard H. Pildes & Richard G. Niemi, *Expressive Harms, "Bizarre Districts," and Voting Rights: Evaluating Election-District Appearances After* Shaw v. Reno, 92 MICH. L. REV. 483, 511-15 (1993); *cf. Brown v. Bd. of Educ.*, 347 U.S. 483, 494 (1954).

[10] *See, e.g.*, *Van Orden v. Perry*, 545 U.S. 677, 682 (2005); *McCreary County*, 545 U.S. at 853; *Lee*, 505 U.S. at 581; *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 587 (1989); *Edwards v. Aguillard*, 482 U.S. 578, 581 (1987); *Wallace v. Jaffree*, 472 U.S. 38, 42 (1985); *Lynch*, 465 U.S. at 671; *see also* Op. at 11-12 & n.4.

suffer physical injury or pecuniary loss. Rather the spiritual, value-laden beliefs of the plaintiffs are often most directly affected by an alleged establishment of religion. Accordingly, rules of standing recognize that noneconomic or intangible injury may suffice to make an Establishment Clause claim justiciable.

*Suhre*, 131 F.3d at 1086 (quotation marks and citations omitted); *see supra* note 5.

Equally problematic is the court's attempt to contrast appellants' case with those where the government has, in the court's words, "actively and directly communicat[ed] a religious message through religious words or religious symbols," Op. at 12. Establishment Clause precedent is not so conveniently cabined into the narrow circumstances described by the court, where the government itself "engag[ed] in religious speech," *id.* For one thing, the government need not intentionally favor one religious denomination over another in order to violate the Establishment Clause if its action has such an effect.[11] When considering whether a government action has the effect of conveying a denominational endorsement, "[t]he question of governmental neutrality is not concluded by the observation that [a policy] on its face makes no discrimination between religions." *Gillette v. United States*, 401 U.S. 437, 452 (1971). Equally important, there also is no requirement that the

---

[11] *See, e.g.*, *Agostini v. Felton*, 521 U.S. 203, 223 (1997); *County of Allegheny*, 492 U.S. at 592-93; *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 125-26 (1982); *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971); *Mt. Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 758 (D.C. Cir. 2007); *United Christian Scientists v. Christian Sci. Bd. of Dirs., First Church of Christ, Scientist*, 829 F.2d 1152, 1161-62 (D.C. Cir. 1987); *Allen v. Morton*, 495 F.2d 65, 69-70 (D.C. Cir. 1973) (Tamm, J., joined by Robb, J., concurring).

government go so far as to use "religious words or religious symbols," Op. at 12, to establish an unconstitutional religious endorsement. Rather, "the Establishment Clause forbids subtle departures from neutrality, 'religious gerrymanders,' as well as obvious abuses." *Gillette*, 401 U.S. at 452 (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 696 (1970) (Harlan, J., concurring)). And, "the most basic command of the Establishment Clause — not to prefer some religions (and thereby some approaches to indoctrinating religion) to others" — does not apply only to a government action such as a prayer or ceremony that explicitly adopts a denomination's chosen religious symbols, but also to other action taken in the usual course of government regulation or operation. *Univ. of Great Falls v. NLRB*, 278 F.3d 1335, 1346 (D.C. Cir. 2002) (citing *Larson v. Valente*, 456 U.S. 228, 244 (1982)); *see, e.g.*, *Mt. Royal Joint Venture*, 477 F.3d at 758; *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 294 (5th Cir. 2001). Thus, government action that draws a line around a religious denomination in a community can send a symbolic message of preference that needs no words just as easily as the government's direct presentation of a religious symbol. *See, e.g.*, *Kiryas Joel Vill.*, 512 U.S. at 697 (citing *Larkin*, 459 U.S. at 125-26).

The court ignores all of this precedent in adopting the novel conception that appellants are not harmed for purposes of standing under the Establishment Clause unless the Navy itself directly uses religious words or symbols as occurred in the religious display cases, Op. at 12, 14. Rather than distinguish precedent in a reasoned manner, the court's holding is the assertion that "[w]hen plaintiffs are not themselves affected by a government *action* except through their abstract offense at the message allegedly conveyed by that action, they have not shown injury-in-fact to bring an Establishment Clause claim, at least outside the distinct context of the religious display and prayer cases." *Id.* at 14 (emphasis in original). Yet, "[t]he

Establishment Clause, at the very least, prohibits government from *appearing* to take a position on questions of religious belief or from 'making adherence to a religion relevant in any way to a person's standing in the . . . community,'" *County of Allegheny*, 492 U.S. at 594 (quoting *Lynch*, 465 U.S. at 687 (O'Connor, J., concurring)) (emphasis added), and so directs the government to avoid a practice that "*may appear* to the nonbeliever or dissenter to be an attempt to employ the machinery of the [government] to enforce a religious orthodoxy," *Lee*, 505 U.S. at 592 (emphasis added). Moreover, when a court reaches the merits "[i]n cases involving [government] participation in a religious activity" — such as the employment of Navy chaplains as religious ministry professionals — the question is "whether an objective observer . . . would perceive [its action] as a [governmental] endorsement" of religion. *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 308 (quotation marks omitted). Even so secular an act as the grant of a copyright, this court held, ran aground because providing exceptional copyright benefits to a particular religious institution "bestowed upon the Church . . . symbolic recognition as guardian of the [contested] text," with consequent practical advantages, and "ha[d] the unmistakable effect of advancing the Church's cause." *United Christian Scientists*, 829 F.2d at 1171. Although the religious institution alone used religious words and symbols, the government's unusual treatment of one church "unequivocally and unqualifiedly endorsed [it] as first interpreter and guardian of th[e] [copyrighted] work." *Id*. at 1170; *see also Commack*, 294 F.3d at 425.

Here, within the context of their chaplaincy assignments and in the absence of a legitimate explanation, the 4109 program could fairly be understood as a religious endorsement because it has the effect of selecting particular "religious words and symbols," Op. at 12, to play an enhanced role within the Navy Chaplain Corps by specially retaining only representatives of the

Catholic faith for extended service in which they engage in religious speech on behalf of that Corps. *See Santa Fe Indep. Sch. Dist.*, 530 U.S. at 307-09. The job of a 4109 chaplain, as for all chaplains, requires representing a particular denomination as a "religious ministry professional," an "individual endorsed to represent a religious organization and to conduct its religious observances or ceremonies." Instruction 1304.28, Guidance for the Appointment of Chaplains for the Military Departments ¶¶ 6, E.2.1.9 (Dep't of Def. June 11, 2004); *see England*, 375 F.3d at 1171.[12] So understood, due to appellants' direct exposure to the 4109 program's preference for Catholics, the Navy conveys to them the "message . . . that [as nonadherents of the favored denomination] they are outsiders, not full members of the . . . community," *McCreary County*, 545 U.S. at 860 (quotation marks omitted), for "the government[] [appears to be] lending its support to the communication of a religious organization's religious message," *County of Allegheny*, 492 U.S. at 601; *see Larkin*, 459 U.S. at 125-26; *Commack*, 294 F.3d at 425; *United Christian Scientists*, 829 F.2d at 1170-71, and thus causes them psychological harm as Navy chaplains that is cognizable under the Establishment Clause.

In any event, whether the Navy's 4109 program sends a prohibited message is a merits question that is not before the court, *see Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*, 338 F.3d 1024, 1029 (D.C. Cir. 2003). Of course, the court's premature determination of this issue may arise from the realization that if a personally observed religious message causes harm "there would be traditional standing," as the Navy's counsel acknowledged, Oral Arg. Tr. at 13; *see also id.* at 18-22.

---

[12] *See also* Instruction 1730.7B, Religious Ministry Support within the Department of the Navy ¶ 4.a (Dep't of Navy, Ofc. of Sec'y Oct. 12, 2000); Instruction 1730.1D, Religious Ministry in the Navy ¶ 4 (Dep't of Navy, Ofc. of Ch. of Naval Operations May 6, 2003).

At this point in the proceedings in determining Article III standing, however, the court must assume the merits of appellants' charge that the Navy's 4109 program "d[oes], in fact, convey" a message of denominational preference directly harming them as chaplains. *Vasquez*, 487 F.3d at 1251; *see Warth,* 422 U.S. at 500, 502; *Info. Handling Servs.*, 338 F.3d at 1029; *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003).

Under the Establishment Clause, then, appellants' membership in a narrowly defined community — the Navy Chaplain Corps — directly affected by the 4109 program, and the message this program communicates to them as chaplains particularizes their injury-in-fact, for "[t]he practices of [one's] own community may create a larger psychological wound than someplace [one is] just passing through," *Washegesic*, 33 F.3d at 683, by making one feel like a "second class citizen[]," *Saladin*, 812 F.2d at 693; *see Suhre*, 131 F.3d at 1090. This directly follows from *Chaplaincy* and Supreme Court precedent, both of which the court misconstrues. Because appellants' injury-in-fact is traceable to the Navy's 4109 program and is likely to be redressed by holding that the program is unlawful and enjoining preferential treatment of 4109 chaplains and the message it sends to appellants, they also meet the other prongs of the standing test, *see Lujan*, 504 U.S. at 560-61.

Accordingly, I would reverse the denial of the motion for a preliminary injunction and leave for the district court to determine upon remand whether appellants have otherwise met the requirements for obtaining a preliminary injunction, *see Chaplaincy*, 454 F.3d at 305, and respectfully dissent. Because appellants have Article III standing, I do not reach the question whether they also have taxpayer standing.